United States District Court
Middle District of Florida
Jacksonville Division

UNITED STATES OF AMERICA EX REL.
DONNA NICHOLS,

   *Plaintiff,*

v.            No. 3:12-CV-1080-J-39PDB

THE SLEEP MEDICINE CENTER ETC.,

   *Defendant.*

_____

## Report and Recommendation[1]

Before the Court is relator Donna Nichols's amended petition for attorney's fees and costs[2] against defendants The Sleep Medicine Center, Hubert Zachary, and George Restea, Doc. 60, as supplemented, Doc. 75.[3] No defendant has responded.

### I. Background

In July 2012, Nichols retained The Employment Law Group, P.C., a Washington, D.C., law firm, on a contingency-fee basis.[4] Doc. 60-1 at 10; Doc. 60-8 at 8. The Employment Law Group retained Shutts & Bowen, LLC, a law firm with a Florida office, to serve as local counsel. Doc. 60-7 at 4.

In October 2012, Nichols, through counsel, filed a qui tam complaint under seal. Doc. 1. She alleged she is a Florida resident who had worked for The Sleep Medicine Center, Zachary had owned and managed The Sleep Medicine Center, and Restea is a physician who had signed prescriptions and billing documents for The Sleep Medicine Center. Doc. 1 at 3−4. She alleged they and two other physicians

(George Young and John Decerce) had violated the False Claims Act, 31 U.S.C. §§ 3729–3733, and the Florida False Claims Act, Fla. Stat. §§ 68.081–68.092, by billing for services not provided, services provided by unlicensed physicians, office visits that had not occurred, and office visits that had involved only picking up equipment. Doc. 1 at 2–3, 12–14. She alleged they had violated the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), by maintaining a structured compensation system for outside physicians in exchange for patient referrals. Doc. 1 at 2, 14–15. And she alleged they had violated the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), by firing her because she asked questions.[5] Doc. 1 at 11–12, 15. She prayed for attorney's fees, expenses, and costs under 31 U.S.C. § 3730(d) (a provision of the False Claims Act) and for other relief. Doc. 1 at 16.

With Nichols's help, the United States spent almost two years investigating the claims. Docs. 16, 17, 19, 20, 22, 23, 25, 26, 31, 32, 34, 35; Doc. 60-8 at 8–9.

In August 2014, the United States, Nichols, The Sleep Medicine Center, and Zachary entered into a written settlement agreement. Doc. 75-1. Zachary and The Sleep Medicine Center agreed to pay the United States **$200,000** plus interest in 19 installments, to voluntarily exclude themselves from participation in federal healthcare programs for 8 years, to the entry of a consent judgment against them for **$1,659,800** plus interest upon an uncured default, and to financial-disclosure and cooperation provisions. Doc. 75-1 at 3–6, 9–11, 14, 20–22. The United States agreed to pay Nichols 20 percent of the payments from them and to release them from liability under the False Claims Act and related common law claims. Doc. 75-1 at 5–6.

2

Nichols agreed to release The Sleep Medicine Center and Zachary from "any civil monetary claim" under the False Claims Act and the Florida False Claims Act. Doc. 75-1 at 6. The United States and Nichols agreed to promptly stipulate to dismissal of claims against The Sleep Medicine Center and Zachary in this case. Doc. 75-1 at 14.

The United States, Nichols, and Restea entered into a similar settlement agreement, except Restea agreed to pay the United States **$90,324** plus interest and did not agree to voluntarily exclude himself from participation in federal healthcare programs or to financial-disclosure and cooperation provisions, and Nichols did not release him from liability. *See generally* Doc. 75-2.

In September 2014, the Court unsealed the qui tam complaint and the United States filed a notice of election to intervene. Docs. 2, 3. The United States filed a stipulation of dismissal of the claims against The Sleep Medicine Center, Zachary, and Restea. Doc. 38. The stipulation specified it did not affect "the claims brought by Relator in her own behalf." Doc. 38 at 1. The Court dismissed with prejudice "all civil monetary claims on behalf of the United States" against The Sleep Medicine Center, Zachary, and Restea. Doc. 39. Nichols filed a bill of costs for the **$350** filing fee, and the clerk taxed that amount against them. Docs. 4, 8. She also filed a petition for an award of attorney's fees and costs against them, and the Court ordered them to respond. Docs. 5, 45. She explained her attorneys had tried to negotiate attorney's fees and costs with their attorneys without success. Doc. 60-1 at 6; Doc. 60-7 at 4.

In September 2014, the clerk issued summonses for The Sleep Medicine Center and Zachary. Doc. 6; Doc. 73-3 at 21. In October 2014, the clerk issued a summons for

Restea. Doc. 44; Doc. 73-1 at 24. In November 2014, a process server served the summons, complaint, bill of costs, and attorney's fee petition on Restea. Doc. 46.

In December 2014, the United States filed a complaint in intervention against the remaining defendants (Decerce and Young). Doc. 47. The United States also filed the proposed consent judgment against Zachary and The Sleep Medicine Center called for by the settlement agreement for any uncured default. Doc. 49. The Court directed the clerk to delete it because it was not in the form of a motion and had other procedural defects. Doc. 51. Nichols moved for more time to serve The Sleep Medicine Center and Zachary with the summonses and complaint, explaining she had used investigators but neither she nor the United States could find him. Doc. 50. The Court granted the motion and set a July 2015 service-of-process deadline. Doc. 52.

In January 2015, remedying the problems with the earlier-filed proposed consent judgment, the United States moved for the entry of consent judgment against The Sleep Medicine Center and Zachary. Doc. 53. The United States explained they had defaulted by failing to make payments as required by the settlement agreement. Doc. 53. The Court granted the motion and entered a consent judgment for **$1,659,800** plus interest against them. Doc. 55. The Court denied the petition for attorney's fees and costs against them and Restea without prejudice, finding it insufficient. Doc. 54. The Court explained although it listed hours billed, rates charged, attorney qualifications, and awards in other cases, the awards were verdicts—not attorney's fees based on hourly rates—and it included no legal support for requested national as opposed to local rates. Doc. 54 at 1–2.

In February 2015, Nichols filed the amended petition for attorney's fees and costs against The Sleep Medicine Center, Zachary, and Restea that is now before the Court. Doc. 60.

In April 2015, the Court set a hearing on the amended petition.[6] Doc. 66. The Court ordered Nichols to serve The Sleep Medicine Center, Zachary, and Restea with the order setting the hearing and the amended petition. Doc. 66. Nichols notified the Court she had complied regarding Restea but she and the United States still could not find Zachary.[7] Doc. 72 at 1–2; Doc. 73 at 1–2. Supported by a declaration and documentation, she explained a process server had posted the summons, complaint, and other filings at the last known address for The Sleep Medicine Center, a process server had made 12 failed attempts to serve Zachary at addresses associated with him, and her counsel had sent him via certified and first-class mail the summons, complaint, and other filings at addresses associated with him, with delivery to many confirmed.[8] Doc. 72 at 3–5; Doc. 73 at 3–5.

In July 2015, the Court conducted the hearing on the amended petition for attorney's fees and costs.[9] Doc. 74. No defendant attended, through counsel or otherwise. Doc. 74. With the Court's permission, Nichols submitted supplemental briefing. Doc. 75.

In September 2015, the Court entered an order taking under advisement and holding in abeyance the amended petition. Doc. 84. The Court explained its action would promote efficiency by preventing premature and piecemeal resolution of any attorney's fee award given that the remaining defendants (Decerce and Young) were

still defending the case and the requested fees likely had been accrued pursuing the claims against all of the defendants. Doc. 84 at 1–2.

Later that month, the United States, Nichols, and Decerce filed a stipulation of dismissal. Doc. 86. They stipulated, "[T]he action between these Parties, having been fully compromised and settled, be dismissed and without an award of interest, costs or attorney [sic] fees. With respect to the relator's claims against [Decerce], this dismissal should be with prejudice. With respect to the government's intervened claims against [Decerce], this dismissal too should be with prejudice. With respect to the claims that the government has not intervened on, this dismissal should be without prejudice." Doc. 86 at 1. In October 2015, the Court dismissed the claims against Decerce in accordance with the stipulation. Doc. 89.

In January 2016, the United States, Nichols, and Young—the last defendant standing—filed a stipulation of dismissal. Doc. 94. They stipulated, "the action between these Parties, having been fully compromised and settled, be dismissed and without an award of interest, costs or attorney fees. With respect to the relator's claims against [Young], this dismissal should be with prejudice. With respect to the government's intervened claims against [Young], this dismissal too should be with prejudice." Doc. 94 at 1. They added, "Upon dismissal of claims against Defendant [Young], Plaintiffs will have resolved their disputes against all parties. The Plaintiffs thereby respectfully request that this case be closed." Doc. 94 at 1.

In February 2016, in accordance with that request, the Court ordered the case dismissed with prejudice and directed the clerk "to terminate all pending motions and

6

close the file." Doc. 95. Nichols immediately moved to reopen the case to permit a ruling on the amended petition for attorney's fees and costs, Doc. 96, and to reconsider the amended petition, Doc. 97. The Court, under Federal Rule of Civil Procedure 60(a), amended the dismissal order to reserve jurisdiction to decide the amended petition. Doc. 98. The Court therefore denied as moot the motions to reopen and for reconsideration. Doc. 98. The Court then referred the amended petition under 28 U.S.C. § 636(b) and Local Rule 6.01(b) for a report and recommendation. Doc. 99.

## II.   Amended Petition for Attorney's Fees and Costs

Nichols seeks against The Sleep Medicine Center, Zachary, and Restea **$117,264.40**[10] (**$111,091**[11] in attorney's fees based on **362.70**[12] hours of work and **$6173.40** in costs). Doc. 60 at 1; Doc. 60-4 at 27. She explains, "The Department of Justice does not resolve employment claims or issues of attorneys' fees and costs. As such, the settlement agreements with the Defendants allowed [her] counsel to engage in negotiations with Defendants' counsel to resolve such matters.[13] Nichol's [sic] counsel was unable to reach an agreement with Defendants' counsel regarding her employment claim, as well as her attorneys' fees and costs. As such, Nichols submits this [amended petition]." Doc. 60-1 at 6.

To support the requested attorney's fees and costs, Nichols filed with the amended petition the September 2014 order dismissing the claims against The Sleep Medicine Center, Zachary, and Restea, Doc. 60-3 (Exhibit 1); The Employment Law Group's billing entries, Doc. 60-4 (Exhibit 2); The Employment Law Group's costs, Doc. 60-5 (Exhibit 3); a declaration of Scott Oswald, Esquire, Doc. 60-6 (Exhibit 4); a

7

declaration of David Scher, Esquire, Doc. 60-7 (Exhibit 5); a declaration of James Helmer, Esquire, Doc. 60-8 (Exhibit 6); a declaration of Archibald Thomas, Esquire, Doc. 60-9 (Exhibit 7); billing entries based on the *Laffey* matrix,[14] Doc. 60-10 (Exhibit 8); and a declaration of Neil Henrichsen, Esquire, Doc. 60-11 (Exhibit 9).

The billing entries are in a spreadsheet listing each by number, the date the work was performed, the name of the person who performed the work, a description of the work, the time spent on the work, the hourly rate, and the amount billed. Doc. 60-4. They reflect:

| Name | Position | Hours | Rate |
|---|---|---|---|
| Aranibar, Clara | **Project Assistant** | 2.6 | **$90** |
| Becnel, Philip | **Investigator** | 100 | **$190** |
| Benson, Dillan | **Project Assistant** | 1.2 | **$90** |
| Bledsoe, Kenneth | **Law Clerk**[15] | 75.1 | **$190** |
| Kruse, Kellee | **Associate** | .3 | **$375** |
| Carter, Adam | **Principal** | 2 | **$650** |
| Downing, Andrea | **Associate** | 11.7 | **$375** |
| Ebrahimian, Setareh | **Law Clerk** | 65.4 | **$190** |
| Frappaolo, Victoria | **Project Assistant** | 4.7 | **$90, $190** |
| Hinton, Jean[16] | **Paralegal** | 8.3 | **$170** |
| O'Sheehan, Edward | **Local Counsel** | 6.4 | **$350** |
| Oswald, Scott | **Principal** | 6.7 | **$650** |
| Peterson, Richard | **Associate** | 1.6 | **$375** |
| Scher, David | **Principal** | 69 | **$650** |
| Woodfield, Nicholas | **Principal** | 7.7 | **$650** |

Doc. 60-4. The last entry is September 19, 2014 (days before filing the original petition for attorney's fees and costs, Doc. 5). Doc. 60-4 at 27. In his declaration, Oswald explains that, for this case, The Employment Law Group followed its practice of recording time in a computer database and preparing computerized time slips on a monthly basis. Doc. 60-6 at 4–5. He explains he reviews time slips for accuracy, redundancy, and unproductive time and regularly reduces or strikes unwarranted

entries. Doc. 60-6 at 5.

The work described in the billing entries generally was for meeting with Nichols, investigating the claims and persons involved, assisting the United States with its investigation of the claims, preparing the qui tam complaint, participating in settlement discussions, and preparing the original petition for attorney's fees and costs. Doc. 60-7 at 6; *see generally* Doc. 60-4.

Nichols seeks **$650** an hour for principals (Carter, Oswald, Scher, and Woodfield). Doc. 60-1 at 13. They met and corresponded about the case, reviewed and edited documents, and traveled for meetings. *See generally* Doc. 60-4. She seeks **$375** an hour for associates (Downing, Kruse, and Peterson). Doc. 60-1 at 13. They researched legal issues, met and corresponded about the case, and drafted documents. *See generally* Doc. 60-4. She seeks **$190** an hour for an outside investigator (Becnel). *See generally* Doc. 60-4. He gathered information from electronic databases, interviewed Nichols and witnesses, and prepared memoranda and reports. *See generally* Doc. 60-4. She seeks **$190** for law clerks (Bledsoe and Ebrahimian). Doc. 60-1 at 13. They met and corresponded about the case, reviewed documents and orders, researched legal issues, drafted documents, created meeting agendas and minutes, and scanned and distributed documents. *See generally* Doc. 60-4. She seeks **$90** for project assistants (Aranibar, Benson, and Frappaolo). Doc. 60-1 at 13. They scanned and printed documents, prepared mailings, drafted cover letters, and ventured to an AT&T store and Radio Shack to find a cord to download data from Nichols's cellular telephone. *See generally* Doc. 60-4. She seeks **$350** an hour for local

counsel (O'Sheehan). *See generally* Doc. 60-4. He reviewed documents and met and corresponded about the case. *See generally* Doc. 60-4. She seeks **$170** an hour for local counsel's paralegal (Hinton). *See generally* Doc. 60-4. She reviewed documents, drafted correspondence, filed documents, and drove to Jacksonville to hand deliver the qui tam complaint for filing under seal. *See generally* Doc. 60-4. In his declaration, Scher opines The Employment Law Group executed the case with "organized efficiency." Doc. 60-7 at 6.

The costs are in a chart that identifies each by number, date, description, and amount. Doc. 60-5. They were for investigation expenses, the filing fees for this case, the special-admission fees for this case, online legal research, PACER research, mailings, telephone conferencing services, long-distance telephone calls, photocopies, electronic-discovery services, local counsel's fees, travel costs to Jacksonville to hand deliver the qui tam complaint for filing under seal, travel costs to Jacksonville for a meeting with the United States, travel costs to Tampa for a meeting with Nichols, and travel costs to Orlando for a settlement conference. Doc. 60-5.

The declarations state the qualifications of The Employment Law Group,[17] the firm's primary attorneys on the case (Oswald[18] and Scher[19]), the firm's primary law clerks on the case (Bledsoe[20] and Ebrahimian[21]), the outside investigator who worked on the case (Becnel[22]), and attorneys from other firms (Helmer,[23] Thomas,[24] and Henrichsen[25]) who opine on the requested rates. Docs. 60-8, 60-9, 60-11.

Suffice it to say The Employment Law Group is a nationally recognized and much-sought-after firm usually representing employees; Oswald and Scher are well-

regarded, well-credentialed, and well-experienced attorneys in the areas of employment and qui tam litigation; Helmer is well-regarded, well-credentialed, and well-experienced in qui tam litigation and a nationally recognized qui tam author, lecturer, and litigator; Thomas and Henrichsen are well-regarded, well-credentialed, well-experienced, and locally recognized attorneys in the areas of labor and employment law with expertise on local rates for labor and employment work; and Becnel is a well-credentialed and well-experienced private investigator. *See generally* Docs. 60-6−60-9; 60-11. Little or nothing is offered about the remainder of the people who worked on the case.

All of the declarants opine qui tam litigation is highly specialized. Doc. 60-6 at 3; Doc. 60-7 at 7; Doc. 60-8 at 7−9; Doc. 60-9 at 6; Doc. 60-11 at 5. Some provide various reasons: relators usually face well-funded adversaries; there is a substantial risk of no, partial, or delayed payment inherent in contingency-based representation; the False Claims Act has "intricacies" found in no other law (such as mandating filing the qui tam complaint under seal, *see* 31 U.S.C. § 3730(b)(2), the first-to-file rule,[26] and the applicability of the heightened pleading standard in Federal Rule of Civil Procedure 9(b));[27] the False Claims Act remains unfamiliar to most attorneys and judges; attorneys bringing qui tam cases often must litigate far from their usual venues; the False Claims Act envisions a public-private partnership to protect the public treasury that requires cooperation; and "[a]ll qui tam cases involve 'novel issues of law because of the uncertain nature of the various interpretations being placed on the False Claims Act around the nation.'" Doc. 60-8 at 7−9; *accord* Doc. 60-

11

6 at 3–4; Doc. 60-7 at 20. Nichols adds in her amended petition qui tam litigation requires counsel to "master the intricacies of Medicare, medical billing and coding, … rules and regulations, and extremely technical details of procurement contracting, requiring levels of technical expertise akin to those of a patent lawyer." Doc. 75 at 4.

According to Oswald and Scher, The Employment Law Group customarily charges the requested rates in qui tam cases. Doc. 60-6 at 4; Doc. 60-7 at 4. They explain the rates are based on "national qui tam industry standards," which consider the skills and expertise required for qui tam litigation, and on The Employment Law Group's "reputation, experience, expertise, and skill as compared to the national False Claims Act community." Doc. 60-6 at 3–4; Doc. 60-7 at 4–5.

Based on a "good-faith evaluation of all recorded hours of work performed," Oswald and Scher opine **$110,091** constitutes "reasonable and necessary attorneys' fees to successfully litigate this matter." Doc. 60-6 at 5; Doc. 60-7 at 5. Scher opines **$6173.40** constitutes "reasonable and necessary costs expended in litigating this … matter." Doc. 60-7 at 5. And Scher opines local counsel's "expertise and knowledge of local rules were instrumental to the initiation of Nichols' claims." Doc. 60-7 at 4.

While stating he "does not argue that another lawyer [could not] have adequately presented Nichols' case," Scher opines, "The Employment Law Group P.C.'s diligence, strategic investigation of the … fraudulent schemes, information relevant to Nichols' claim and damages, as well as its knowledge of False Claims Act litigation made [it] uniquely situated to provide [her] with the best possible representation" and she "prevailed … largely because of its specialization and focused

preparation." Doc. 60-7 at 7. Contending the United States "successfully recovered **$306,905.00** for the taxpayers," he opines "[e]xceptional success" was obtained. Doc. 60-7 at 7. According to Oswald and Scher, "Had the firm not expended its time and resources prosecuting Nichols' claims, it would have expended its time and resources on other cases and compensable work, the majority of which would have paid full hourly rates." Doc. 60-6 at 4; Doc. 60-7 at 6.

Helmer is "personally acquainted" with Oswald and Scher. Doc. 60-8 at 6. He knows them as "skilled, aggressive, erudite, and highly ethical litigators who are well-respected by their peers." Doc. 60-8 at 6. He "carefully reviewed" The Employment Law Group's "fee submission." Doc. 60-8 at 2. He opines "the time spent and work performed by the attorneys, law clerks, paralegals, and project assistants is reasonable and necessary given the complexity of the issues presented and the experience necessary to successfully prosecute a claim under the False Claims Act." Doc. 60-8 at 6. He opines The Employment Law Group used law clerks to minimize the fees and "billing judgment has been exercised to ensure that none of the time for which reimbursement is sought is excessive, redundant, or otherwise unnecessary." Doc. 60-8 at 1, 6. He opines the settlement "was due in large part to the resources and expertise Relator's counsel poured into this case." Doc. 60-8 at 9. Contending "**$300,000.00** was recovered for the taxpayers as a result of this case," he opines, "[s]ignificant success was obtained in this case."[28] Doc. 60-8 at 9.

Helmer's regular hourly billing rate is **$660**. Doc. 60-8 at 7. He opines that, based on his experience, his "firm's current hourly rates are well within the range

13

charged by other counsel in similar areas of practice throughout the nation overall." Doc. 60-8 at 7–8. He believes "[i]t is appropriate that those few counsel who handle these cases be considered a national bar and compensated at national rates." Doc. 60-8 at 7. He opines, "Based on my knowledge of Mr. Oswald's and Mr. Scher's skill set, the result obtained, my knowledge of billing rates at my firm, my knowledge of billing rates at other law firms that engage in False Claims Act litigation, I think the work performed and the hourly rates sought by Relator are extremely reasonable, both from the perspective of a sophisticated national False Claims Act practice and for complex litigation." Doc. 60-8 at 7–8. And he opines, based on the results obtained, the requested "costs[] and expenses are more than reasonable." Doc. 60-8 at 8.

Thomas and Henrichsen provide opinions nearly identical to one another's. *Compare* Doc. 60-9 *with* Doc. 60-11. They are familiar with The Employment Law Group's, Oswald's, and Scher's reputations within the employment-law bar and with Oswald's and Scher's various court admissions. Doc. 60-9 at 4–5; Doc. 60-11 at 3–4. They opine "rates customarily charged in Jacksonville for non-qui tam legal services are lower [Thomas says "substantially lower"] than those charged in Washington, D.C. and the national qui tam market." Doc. 60-9 at 6; Doc. 60-11 at 5. They opine very few attorneys practice qui tam litigation in the Middle District of Florida. Doc. 60-9 at 6; Doc. 60-11 at 5. Thomas opines the local market hourly rate for an attorney with his experience for non-qui-tam services is **$375**; Henrichsen, **$400**. Doc. 60-9 at 6; Doc. 60-11 at 6. They state, "because the case at issue in [sic] a qui tam action and there are very few qui tam attorneys in the Middle District of Florida, I believe it is

14

appropriate to apply a contingency multiplier of 1.5–2.5 to the local market rates. As such, I believe that the rates sought by Mr. Oswald and Mr. Scher are reasonable in this matter." Doc. 60-9 at 6; Doc. 60-11 at 5. Thomas and Henrichsen were not compensated and are not seeking compensation for their opinions. Doc. 60-9 at 6; Doc. 60-11 at 6.

Nichols claims entitlement to alternative attorney's fees of **$83,138** based on rates determined by the *Laffey* matrix if the Court "does not see it fit to grant [her] a national rate or a multiplier of the local market rate in Jacksonville." Doc. 60-1 at 22; *see also* Doc. 60-10 (billing entries using *Laffey* matrix).

### III.    Law & Analysis

Under 31 U.S.C. § 3730(d), if the United States intervenes in a qui tam case, the relator is entitled to a percentage of the proceeds of the case or settlement and "an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." The provision incentivizes "whistleblowers to step forward and attorneys to pursue such actions." *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,* 41 F.3d 1032, 1035 (9th Cir. 1994) (internal quotation marks omitted). Because the United States intervened and the case against Zachary, The Sleep Medicine Center, and Restea settled, Docs. 2, 75-1, 75-2, the Court "shall" award Nichols reasonable attorney's fees, expenses, and costs against them, *see* 31 U.S.C. § 3730(d) (quoted).

### A.      Attorney's Fees

To decide "reasonable attorneys' fees" under the False Claims Act, *see* 31 U.S.C. § 3730(d) (quoted), a court should apply the lodestar approach in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), and *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). *U.S. ex rel. Jacobs v. Patrol Servs. Inc.*, 202 F. App'x 357, 359 (11th Cir. 2006).[29] Under that approach, the court's "starting point" is a calculation of the lodestar figure, which is "the number of hours reasonably expended … multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. The court then must consider other factors that require an adjustment of the lodestar figure to arrive at a reasonable amount. *Id.* at 433–37.

A fee petition "should not result in a second major litigation." *Id.* at 437. The petitioner has "the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* at 437. To satisfy that burden, the petitioner must produce more than an affidavit of the attorney who performed the work. *Norman*, 836 F.2d at 1299. "Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence." *Id.* The weight given opinion evidence "will be affected by the detail … in the testimony on matters such as similarity of skill, reputation, experience, similarity of case and client, and breadth of the sample of which the expert has knowledge." *Id.* The petitioner also must establish an adjustment of the lodestar figure is necessary and to do so must present "specific" evidence. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010).

If evidence is inadequate, a court may reduce an award, *Hensley*, 461 U.S. at 433−34, or "make the award on its own experience" without further filings or an evidentiary hearing, *Norman*, 836 F.2d at 1303. "The court's order … must allow meaningful review—the district court must articulate the decisions it made, give principled reasons for those decisions, and show its calculation." *Id.* at 1304. "If the court disallows hours, it must explain which hours are disallowed and show why an award of these hours would be improper." *Id.*

Nichols sets forth the lodestar approach but organizes her argument by use of the twelve factors in *Johnson v. Ga. Hwy. Exp., Inc.*, 488 F.2d 714, 717−19 (5th Cir. 1974), *overruled on other grounds, Blanchard v. Bergeron*, 489 U.S. 87, 91−93 (1989), contending most or all of them favor her requested attorney's fees. Doc. 60-1 at 9−22. The factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Doc. 60-1 at 9−22.

This report and recommendation does not organize the analysis of the requested attorney's fees in that manner. The Supreme Court has repeatedly criticized the *Johnson*-centric approach—one widely used *before* the Court adopted

17

the lodestar approach—observing it "gave very little actual guidance to district courts" and lamenting, "[s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." *Perdue*, 559 U.S. at 551. In contrast, the Court has explained, the lodestar approach produces a rough approximation of the fee a prevailing attorney would have received from a paying client, is readily administrable, and is objective. *Id.* at 551−52*; accord Blanchard*, 489 U.S. at 94 ("[W]e have adopted the lodestar approach as the centerpiece of attorney's fee awards. The *Johnson* factors may be relevant in adjusting the lodestar amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended."). This report and recommendation organizes the analysis of the requested attorney's fees under the lodestar approach, considering the *Johnson* factors only to the extent they are pertinent and not already subsumed in the lodestar figure.

*1.    Hours Reasonably Expended*

The first part of the lodestar approach requires a court to determine the hours reasonably expended and exclude any that had not been. *Hensley*, 461 U.S. at 433−34. "Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Id.* at 434. Attorneys "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.* "[A] lawyer may not be compensated for hours spent on activities for which he would not bill a client of means who was seriously intent on vindicating similar rights, recognizing that in the private sector the economically rational person engages in some cost benefit analysis."

*Norman*, 836 F.2d at 1301.

There is "nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." *Id.* at 1301−02. Thus, "time spent in attorney conferences is generally compensable for each participant [because] attorneys must spend at least some of their time conferring with colleagues, particularly their subordinates, to ensure that a case is managed in an effective as well as efficient manner." *Am. Charities for Reasonable Fundraising Reg., Inc. v. Pinellas Cty.*, 278 F. Supp. 2d 1301, 1315 (M.D. Fla. 2003) (internal quotation marks omitted). Still, a court may discount time billed for too many attorneys when fewer would do. *Am. Civil Liberty Union of Ga. v. Barnes*, 168 F.3d 423, 433 (11th Cir. 1999). "In the final analysis, exclusions for excessive or unnecessary work on given tasks must be left to the discretion of the district court." *Norman*, 836 F.2d at 1301.

Because paralegals and law clerks often perform work "that might otherwise be performed by a lawyer and billed at a higher rate," such as "factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence," a court may compensate a successful litigant for time spent by them if the prevailing practice in the local community is to separately bill for their work. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285–88 (1989). Investigators may fall in that category if their work was in the

19

nature of a paralegal's work. *Trotter v. Columbia Sussex Corp.*, No. CIV. A. 08-0412-WS-M, 2010 WL 383622, at *11 (S.D. Ala. Jan. 29, 2010) (unpublished).

In contrast, work by "secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product" is usually subsumed in the rates already charged by attorneys. *Jenkins*, 491 U.S. at 285; *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 582–83 (2008). Billing separately for "such items as secretarial time, paper clips, electricity, and other expenses" is not justified unless it is the "prevailing practice in the local community." *Jenkins*, 491 U.S. at 287 n.9. If work is "purely clerical or secretarial," it should not be billed at paralegal or attorney rates, even if a paralegal or attorney performs it. *Id.* at 288 n.10. This Court has routinely denied fees for clerical or secretarial work. *See, e.g., Grigoli v. Scott Cochrane Inc.*, 8:14-cv-844-T-23EAJ, 2015 WL 4529032, at *7–8 (M.D. Fla. Jul. 27, 2015) (unpublished); *Gray v. Novell, Inc.*, 8:06-cv-1950-T-33TGW, 2012 WL 3871872, at *8 (M.D. Fla. Sept. 6, 2012) (unpublished); *Cook v. Law Offices of Forster & Garbus*, 6:10-cv-934-Orl-28KRS, 2010 WL 4941439, at *2 (M.D. Fla. Nov. 3, 2010) (unpublished), *r&r adopted*, 6:10-cv-934, 2010 WL 4941659 (M.D. Fla. Nov. 29, 2010) (unpublished); *Scelta v. Deli. Supp. Servs., Inc.*, 203 F. Supp. 2d 1328, 1334 (M.D. Fla. 2002)

Nichols seeks compensation for **362.70** hours of work. Doc. 60-4 at 27. Citing Oswald's declaration, she states he "reviewed the billing entries in this case on a monthly basis, and [The Employment Law Group] removed any excessive or unnecessary hours for work performed by its attorneys and staff as well as any other billable time in other circumstances in which it deemed necessary to cut." Doc. 60-1

20

at 10 (citing Doc. 60-6 ¶ 14). Citing Scher's declaration, she adds The Employment Law Group has found the requested fees to "have been fair and reasonably necessary to the litigation after making a good-faith evaluation of all recorded hours of work performed in relation to Nichols' case." Doc. 60-1 at 10 (citing Doc. 60-7 ¶ 14−15).

I recommend excluding the following hours as "excessive, redundant, or otherwise unnecessary." *See Hensley*, 461 U.S. at 434 (quoted).

I recommend excluding **7.5** hours entered by paralegal Hinton for travel to Jacksonville to hand deliver the qui tam complaint for filing under seal, Doc. 60-4 (entry 196). A relator may file a qui tam complaint under seal by express mail delivery to the clerk's office; paper filing is required but hand delivery is not. *See* Local Rule 1.09(b); Admin. Procedures for Electronic Filing, III.C.3.c. Even considering the first-to-file rule, Nichols has not shown why **$1275** worth of travel (plus gas mileage) was necessary when a lesser amount for same-day delivery would have sufficed. In addition, Nichols separately and unjustifiably seeks the same compensation for the same things under costs. *Compare* Doc. 60-4 at 12 *with* Doc. 60-5 at 4.

I recommend excluding **7.1** hours entered by law clerk Bledsoe (**3.3** hours) and principal Scher (**3.8** hours), for work relating to media and marketing strategy; for example, "Drafted and sent email to ABC producer with strip club pictures and American Board of Sleep Medicine Information," "Scher and … Bledsoe held a marketing teleconference with ABC," "Created custom map from case for use in marketing," and "Attend meeting with Scott Sobel to discuss media and marketing strategy," Doc. 60-4 (entries 269, 276−280, 282, 285−287). A fee-paying client

21

assuredly would balk at paying a firm's marketing expenses. Nichols has not shown how any such "strategy" benefited the case and it is not apparent how it could have.[30] This Court has excluded hours for this type of work before. *See United States ex rel Ferrara v. Rosin*, No. 8:04-cv-349-T-30MAP, 2009 WL 580321, at *1 (M.D. Fla. Mar. 6, 2009) (unpublished).

I recommend excluding **8.5** hours entered by project assistants Benson (**1.2**), Frappaolo (**4.7**), and Aranibar (**2.6**), for scanning documents, printing documents, preparing mailings, searching stores for the data-transfer cord, and the like. Doc. 60-2 (entries 7, 57, 58, 81, 84, 86, 90, 94, 111, 134, 138, 161, 173, 194, 197, 199, 231, 260, 261, 284, 303). That work is purely clerical or secretarial work presumably subsumed in the rates already charged by the attorneys. *See Richlin*, 553 U.S. at 582−83; *Jenkins*, 491 U.S. at 285. Nichols has not shown separate billing for that type of work is customary here, there, or anywhere to justify separate compensation for it, and I am unaware of any such custom.

I recommend excluding **10 percent** of the hours entered by law clerks Bledsoe (**7.18**) and Ebrahimian (**6.54**) for purely clerical or secretarial work, *see, e.g.,* Doc. 60-4 at 14 (scan and circulate a motion and create and circulate contact information cards), 16 (consolidate and reorganize the file cabinet and calendar a meeting), 17 (create a CD of client's documents and prepare it for mailing, create a contact-information card, and re-calendar a deadline), or for that type of work combined with paralegal work, *see, e.g.,* Doc. 60-4 at 5 (have telephone conversation with client and calendar later conversation), 10 (create exhibits, compile them into a single

22

document, and email client). I recommend a percentage rather than a specific number of hours because the work cannot be segregated using the information provided.

I recommend excluding **2** hours entered by principal Carter for preparing for and attending a meeting early in the representation of Nichols, Doc. 60-4 (entries 36, 37). After those two hours, he spent no more time on the case. *See generally* Doc. 60-4. Nichols has not shown he distinctly contributed to the case through his participation in that initial meeting, and it is not evident he did in light of the three other principals and one associate from The Employment Law Group who attended and individually entered time for the same meeting (Downing, Oswald, Scher, and Woodfield) for requested fees of **$2325** for an hour-long meeting. *See* Doc. 60-4 (entries 39, 41, 43, 56). The presence of so many principals at an initial meeting appears to benefit The Employment Law Group itself in deciding whether it should take on a matter rather than the presentation and prosecution of the case itself.

I do not recommend further exclusions for staffing of meetings by multiple billers under the assumption they needed to confer with colleagues to ensure effective management of the case. *See Am. Charities*, 278 F. Supp. 2d at 1315. Although "organized efficiency" does not appear to characterize every meeting, no defendant has appeared to make that argument, and the declarations tout otherwise. *See* Doc. 60-7 at 6 (quoted).

Thus, I recommend excluding **7.5** hours for travel to hand deliver the qui tam complaint for filing under seal, **7.1** hours of for work on media and marketing strategy, **8.5** hours for clerical and secretarial work, a **10-percent** reduction of the

hours billed by law clerks for clerical and secretarial work, and **2** hours for unnecessary billing for a principal on top of three other principals and an associate at the initial meeting. I recommend allowing all other hours.

2.     *Reasonable Hourly Rates*

The second part of the lodestar approach requires a court to determine the reasonable hourly rates. *Hensley*, 461 U.S. at 433–34. A "reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. The relevant legal community is where the case is filed. *Barnes*, 168 F.3d at 437; *see, e.g.*, *Ceres Envtl. Servs., Inc. v. Colonel McCrary Trucking, LLC,* 476 F. App'x 198, 202 (11th Cir. 2012) ("Because the case was filed in Mobile, the district court properly found that Mobile was the relevant market."). "If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims." *Barnes*, 168 F.3d at 437.

"No two lawyers possess the same skills, and no lawyer always performs at the same level of skill." *Norman*, 836 F.2d at 1300. "Accordingly, [t]he parties ought to provide the court with a range of market rates for lawyers of different skill levels (perhaps as measured by quality and quantity of experience) involved in similar cases with similar clients, so that the court may interpolate the prevailing market rate based on an assessment of the skill demonstrated in the case at bar." *Id.*

"[T]he best information available to the court is usually a range of fees set by

the market place, with the variants best explained by reference to an attorney's demonstrated skill." *Id.* at 1301. "It is the job of the … court … to interpolate the reasonable rate based on an analysis of the skills enumerated … which were exhibited by the attorney in the case at bar, remembering that the highest market rates are not theoretical rates for the perfect lawyer and that the lowest market rates are being earned not by imbeciles but by men and women who are proud to say they are attorneys, who are good enough to earn a livelihood from the profession, and who are at least well enough qualified to be admitted to the bar." *Id.* "[A]t least some of the *Johnson* factors [still] have utility in establishing the hourly rate"; for example, to determine the weight to give rates offered for comparison.[31] *Id.* at 1299.

Henrichsen's and Thomas's declarations, Docs. 60-9, 60-11, together with my experience, establish the prevailing market rate in Jacksonville for similar services (qui tam or complex commercial or employment litigation) by attorneys of reasonably comparable skills, experience, and reputation to Oswald and Scher (well-credentialed, well-experienced, and well-regarded) is the high-end partner rate of **$450** an hour. I recommend that rate for Oswald and Scher.

Nichols offers nothing to show the skills, experience, and reputation of Woodfield for whom she seeks **$650** an hour, the associates (Downing, Kruse, and Peterson) for whom she seeks **$375** an hour, or local counsel (O'Sheehan) for whom she seeks **$350** an hour. *See generally* Doc. 60-4. Although the Court would be within its discretion to exclude the unsupported requests altogether, *see Patrol Servs.*, 202 F. App'x at 363−64 (affirming exclusion of unsupported requests), I do not recommend

25

that exclusion as too harsh under the circumstances (Nichols's advocacy for national rates no matter the skills, experience, and reputations of the persons performing the work). Instead, without more to justify higher rates, I recommend awarding Woodfield the low-end prevailing market rate in Jacksonville for new partners, which, based on my experience, is **$250** an hour. I recommend awarding the associates the low-end prevailing market rate in Jacksonville for new associates, which, based on my experience, is **$175** an hour. Not knowing if O'Sheehan is a partner or an associate, I recommend the same rate for him.

Nichols likewise offers nothing to show the skills, experience, and reputation of the law clerks who worked on the case (Bledsoe and Ebrahimian), except to say both have college degrees and had been attending law school at night while working on the case, and that Bledsoe has worked there since 2012 (the same year he began work on the case, *see* Doc. 60-4 at 4). Doc. 60-7 at 3−4. And she offers nothing to show it is the prevailing practice in Jacksonville to separately bill for law clerk and paralegal work, though I know that is the prevailing practice here. For them, I recommend applying the prevailing market rate in Jacksonville for law students, which, based on my experience, is **$125** an hour.

Nichols offers information about the investigator who worked on the case (Becnel), for whom she seeks **$190** an hour, Doc. 60-7 at 4, but nothing to show the prevailing market rate in Jacksonville for similar services by investigators with reasonably comparable skills, experience, and reputation. For him, I recommend applying the prevailing market rate in Jacksonville for experienced paralegals

26

because he is well-experienced and provided paralegal-type services (gathering information from databases, interviewing Nichols and witnesses, and preparing memoranda and reports) which, based on my experience, is **$125** an hour.

Nichols offers nothing to show the skills, experience, and reputation of the project assistants who worked on the case (Aranibar, Benson, and Frappaolo) or local counsel's paralegal (Hinton). Because the project assistants' work was purely secretarial or clerical and thus already excluded, there is no need to establish a reasonable rate for them. Hinton's travel to Jacksonville was unnecessary and has already been omitted, but her other billing entry is compensable as paralegal-type work ("Prepare e-mail and discuss procedures with Mr. O'Sheehan regarding the Complaint filed under seal, Motion filed under seal and Judge Adam's [sic] procedures," Doc. 60-4 at 12, entry 201). For her, I recommend applying the low-end prevailing market rate in Jacksonville for a paralegal with little or no experience which, based on my experience, is **$100** an hour.

The recommended rates generally follow those awarded by this Court in qui tam cases in recent years. *See U.S. ex rel. Mustafa v. Najjar*, No. 6:10-cv-414-Orl-31DAB (M.D. Fla. Oct. 9, 2014) (unpublished) (Docs. 170-1, 254) (Orlando case awarding fees based on hourly rate of **$425** for D.C. attorney with national qui tam practice and experience equal to or greater than Oswald and Scher, fees based on hourly rate of **$325** for D.C. associate with 7 years' civil litigation experience, and fees based on hourly rate of **$100** for paralegals with college degrees and "excellent undergraduate credentials"); *Ferrara v. Rosin*, No. 8:04-cv-349-T-30MAP (M.D. Fla.

27

Mar. 6, 2009) (unpublished) (Docs. 93, 98) (Tampa case awarding requested hourly rate of **$350** for "leading relator's attorney in the Middle District of Florida," with 22 years' experience as an Assistant United States Attorney, service as Health Care Coordinator for the United States Attorney's Office, service on the Department of Justice's National Health Care Fraud Working Group, recipient of the United States Department of Health and Human Services Inspector General's Integrity Award, and authorship of a health care fraud treatise); *U.S. ex rel. Lofthouse v. Telesis Tech. Corp.,* No. 8:05-cv-2058-T-27MSS (M.D. Fla. Feb. 3, 2009) (unpublished) (Doc. 42) (Tampa case reducing requested hourly rate from **$375** to **$300** based on prevailing market rate in Tampa for attorney with 20 years of qui tam litigation experience).

Nichols does not want the Court to apply the "prevailing market rates" in Jacksonville "for similar services by lawyers of reasonably comparable skills, experience, and reputation." *See Norman*, 836 F.2d at 1299 (quoted). She wants the Court to apply "national rates" or, alternatively, the Washington, D.C., rates in the *Laffey* matrix. *See generally* Doc. 60-1 (memorandum); Doc. 60-4 (billing entries using national rates); Doc. 60-10 (billing entries using *Laffey* matrix). To support application of national rates, she contends, "Because qui tam litigation is a national practice … rates should be compared to national rates in this field rather than local rates." Doc. 60-1 at 21. She points to the declarants' opinions to contend the rates are reasonable because qui tam litigation is complex, highly specialized, uncommon, and typically involves non-local attorneys. Doc. 60-1 at 14–18; Doc. 75 at 3–4.

Nichols's argument could be deemed contrary to Eleventh Circuit precedent:

28

"If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims." *Barnes*, 168 F.3d at 437. Scher expressly states he is not arguing another attorney could not have "adequately presented" her claim, Doc. 60-1 at 12, and she has not shown there had been a lack of Jacksonville attorneys willing and able to take her case. At the hearing, her counsel conceded there are attorneys who practice qui tam litigation here. Doc. 60-9 at 6; Doc. 60-11 at 5. Henrichsen and Thomas declare there are some, albeit very few. Doc. 60-9 at 6; Doc. 60-11 at 5.

Other courts in the Eleventh Circuit have rejected national-rate requests based on that Eleventh Circuit precedent, including this Court in a similar qui tam case. *See Carnegie v. Mut. Sav. Life Ins. Co.*, No. Civ. A. CV-00S3292NE, 2004 WL 3715446, at *28 (N.D. Ala. Nov. 23, 2004) (unpublished); *U.S. ex rel. Albert D. Campbell v. Lockheed Martin Corp.*, No. 6:95-cv-549-Orl-28DAB, Doc. No. 559 (M.D. Fla. Jul. 27, 2004) (unpublished), *r&r adopted*, Doc. No. 569 (Sept. 10, 2004) (unpublished). In *Campbell*, after settlement of qui tam claims, the relator sought attorney's fees and costs for law firms that had represented him. *Campbell*, 6:95-cv-549, Doc. 559 at 5. He argued applying national rates plus a multiplier was justified because he had tried and failed to find local counsel with the knowledge and experience to handle his claims, his counsel was in Washington, D.C., most of the work was done there, clients had paid higher rates for those legal services, other D.C.-based attorneys opined the national rates were reasonable, and counsel had "national

29

reputations as highly competent and successful litigators with significant False Claims Act expertise." *Id.* at 9–11. This Court reiterated the relevant legal market for determining reasonable hourly rates was where the case was filed and litigated (Orlando or the Middle District of Florida). *Id.* at 11. This Court rejected the national-rate request because the relator had not shown local "counsel with commensurate skills or experience was unavailable." *Id.* at 11–12. Evidence provided by the petitioner's adversary and this Court's own research showed many Florida attorneys practicing qui tam litigation here. *Id.* at 11−12. This Court observed although the plaintiff "is entitled to choose whomever he pleases to handle his litigation[,] … the Court is not bound to apply the rates [his] chosen attorney charges." *Id.* at 12–13.

Even if Eleventh Circuit precedent would not prevent this Court from applying national rates in exercising its broad discretion in deciding reasonable attorney's fees, the circumstances under which other courts have applied national rates are not present. In *In re "Agent Orange" Product Liability Litigation*, the Second Circuit upheld the use of national rates by a district court bound by Second Circuit precedent similar to Eleventh Circuit precedent but cautioned,

> [T]he issue for review here is whether the district court erred in deviating from this established precedent. While we concede that such conduct in the ordinary case would constitute legal error and require recalculation of the lodestar, we conclude that, in an exceptional multiparty case such as this, where dozens of non-local counsel from all parts of the country are involved, public policy and administrative concerns call for the district court to be given the necessary flexibility to impose a national hourly rate when an adequate factual basis for calculating the rate exists.

818 F.2d 226, 232 (2d Cir. 1987).

30

The main declarants (Oswald, Scher, and Helmer) who advocate here for application of national rates for qui tam litigation are by all known accounts well-regarded, well-credentialed, and well-experienced attorneys. But because they litigate qui tam cases nationally, their opinions are not disinterested, and, in any event, this issue is one of law for the Court to decide.

There are many questions without evident answers raised by application of a range based on national rates in qui tam cases: Should a court use a nationwide average range for qui tam specialists? Should a court use Helmer's rate as the high-end of any national range because he appears to be a preeminent qui tam specialist? Should the rate for an entry-level associate, paralegal, or law clerk providing ordinary case-related services be based on a range of national rates for qui tam specialists? Should the rate for a small-town attorney who pursues a local qui tam case be based on a range of national rates for qui tam specialists? Should the rate for a big-city attorney who pursues a local qui tam case be based on a range of national rates for qui tam specialists even if the range is lower than the range for local prevailing market rates? Should national rates for qui tam specialists apply even if the qui tam case is no more complex than a common-law fraud case?

Even setting those questions aside, there are reasonable—perhaps compelling—counterpoints to the reasons the Nichols and the declarants provide for deeming qui tam litigation so different from other areas that it deserves fee awards based on a range of national rates generally or this case specifically.

That relators usually face well-funded adversaries; that there is a substantial

31

risk of no, partial, or delayed payment; the applicability of Rule 9(b)'s heightened pleading standard; and general bench/bar unfamiliarity with the law are not unique to qui tam litigation. Cases by consumer-rights attorneys or cases praying for punitive damages against corporate defendants that involve most or all of those factors come to mind.

That the False Claims Act has "intricacies" found in no other law (such as mandating filing the qui tam complaint under seal and the first-to-file rule), Doc. 60-8 at 7 (quoted), does not warrant special treatment for attorney's fee awards. However intimidating the "qui tam" name, the False Claims Act itself is straightforward, specifying those and other requirements for bringing a qui tam case. *See generally* 31 U.S.C. §§ 3729–3733. At the hearing, Nichols's counsel explained the law clerks at The Employment Law Group have qui tam expertise even though they do not yet have law degrees or bar memberships. What has been said about tax law—it is "so complex as to be the despair of judges," *Dobson v. Comm'r of Internal Revenue*, 320 U.S. 489, 498 (1943)—is not said about the False Claims Act.

That qui tam litigation is "highly specialized," *see* Doc. 60-6 at 3; Doc. 60-7 at 7; Doc. 60-8 at 7−9; Doc. 60-9 at 6; Doc. 60-11 at 5 (all quoted), does not warrant special treatment for attorney's fee awards. Special practice in any area (family law, trust and estate law, intellectual-property law, medical-malpractice law, toxic-tort law, product-liability law, etc.) may be deemed "highly specialized." And although qui tam litigation may require knowledge of difficult-to-navigate healthcare regulations, a similar statement may be made for other areas. Social-security law, for example,

32

requires knowledge of complex statutes, regulations, agency rulings, agency practices, and medical impairments for which most successful litigants receive local-market-based attorney's fees that Congress capped in the Equal Access to Justice Act at "**$125** per hour unless the court determines that an increase in the cost of living or a special factor … justifies a higher fee," 28 U.S.C. § 2412(d)(2)(A); *see also* 18 U.S.C. § 3599(g) (capping hourly rate of defense counsel in capital cases at **$125** an hour absent Judicial Conference increase).

Helmer states, "[a]ll qui tam cases involve 'novel issues of law because of the uncertain nature of the various interpretations being placed on the False Claims Act around the nation.'" Doc. 60-8 at 9. But Nichols's counsel could articulate no novel issue of law here when asked to do so at the hearing, and none is apparent. Although False Claims Act cases can still involve novel issues of law despite the Act's old age, *see Rainwater v. United States*, 356 U.S. 960, 592 (1958) (discussing history of Act, including its original passage in 1863 and later amendments), they do not appear always.

That qui tam litigation requires a public-private partnership does not favor application of a range of national rates, at least where the range is substantially higher than the range of local rates. The United States' involvement in cases in which it intervenes may well make qui tam litigation much easier, much less expensive, and much less risky to pursue, with the full force of federal government resources and expertise entering into the investigation and eventually assuming primary responsibility for the case. *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S.

33

765, 769 (2000); 31 U.S.C. § 3730(c)(1). Most successful qui tam litigation requires convincing the United States to investigate, intervene, and agree to a maximum percentage of recovery to the relator, but attorneys regardless of specialty are routinely required to draw on their powers of persuasion for their clients' benefit.

That the vast majority of qui tam specialists must bring qui tam cases outside their local jurisdictions seems more like a circumstance accepted by them to maintain a narrow and possibly lucrative practice or a circumstance already considered by the reasonable number of hours expended, which will include travel time, and less like a circumstance warranting application of national rates.

That attorneys should be incentivized to accept qui tam cases is already built into the False Claims Act through the provision of mandatory attorney's fees, costs, and expenses to successful relators and a percentage of proceeds from recoveries that may be subject to contingency-fee agreements. *See* 31 U.S.C. § 3730(d). The growing number of qui tam boutique practices and qui tam cases brought by represented plaintiffs do not suggest additional incentive—much less judicially created incentive—is warranted.[32]

Nichols claims, "The practice of qui tam litigation is … not one typically practiced in Florida. The last time the Middle District of Florida reviewed a qui tam fee petition was in March 2009 and as of January 1, 2009, only **137** qui tam actions have been filed in the Middle District of Florida." Doc. 60-1 at 21. She does not explain from where she obtained those figures. They appear incorrect. The Court's database shows **180** cases under the action codes, "31:3729 False Claims Act" and "31:3730 Qui

34

tam False Claims Act" opened in CM/ECF from January 1, 2009, to February 12, 2015, when the amended petition was filed. That figure includes no False Claims Act case filed under seal and not yet ordered to be unsealed due to ongoing investigations. In any event, it is bold to draw from either number that qui tam litigation is not "typically practiced in Florida." *See* Doc. 60-1 at 21 (quoted). The Court's database also shows more than one order reviewing a fee petition under the False Claims Act in that date range. Regardless, Nichols's counsel represented at the hearing that parties almost always settle attorney's fees and costs to the relator, so the small number of petitions reviewed by the Court supports only that representation, not that qui tam litigation is uncommon here.

Nichols contends, "Recently, several courts have found an award of national rates to be appropriate when awarding attorneys' fees and costs in False Claims Act cases due to the nationwide practice of False Claims Act cases." Doc. 60-1 at 21. But for that contention she cites only *United States ex rel. Liotine v. CDW-Government, Inc.*, No. 3:05-cv-33-DRH-PMF, 2013 WL 5366960 (S.D. Ind. May 17, 2013) (unpublished), and *United States ex rel. Hobbs v. Medquest Associates, Inc.*, No. 3:06-cv-1169, 2012 WL 3561792 (M.D. Tenn. Aug. 16, 2012) (unpublished). At the hearing, the Court asked Nichols's counsel to provide additional cases in supplemental briefing that support national rates for qui tam cases. She added *U.S. ex rel. Becker v. Tools & Metals, Inc.*, No. 3:05-cv-0627-L, 2013 WL 1293818, at *29 n.17 (N.D. Tex. Mar. 31, 2013) (unpublished). *See* Doc. 75.

*Liotine* does not support Nichols's contention; to the contrary, the court in

35

*Liotine* rejected the argument it was establishing "some sort of national qui tam rate," explaining the rate of one qui tam attorney was the same as the rate of another qui tam attorney because they practiced in the same geographic area and possessed the same specialized skills. *See Liotine*, 2013 WL 5366960, at \*3. Nichols argues in her supplemental briefing the Court should apply *Liotine* insofar as the court applied the requested rates because the petitioner satisfied its burden of showing the reasonableness of the requested rates but the defendant failed to satisfy its resulting burden of showing the unreasonableness of the requested rates.[33] Doc. 75 at 2–3. But burden shifting would apply only if Nichols satisfied her initial burden of showing the requested rates are the "prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation," *see Norman*, 836 F.2d at 1299 (quoted), something she has not done.

*Medquest* supports Nichols's contention, but it is based on Sixth Circuit dictum that courts may look to a national market, an area of specialization market, or any other market they believe appropriate to fairly compensate particular attorneys in individual cases, *see Medquest*, 2012 WL 3561792, at \*2 (citing *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983)). She does not explain how applying that dictum here may be reconciled with Eleventh Circuit precedent ("If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims," *Barnes*, 168 F.3d at 437) or, if it could, compelling reasons why it should.

36

In *Becker*, the new case Nichols cites, Doc. 75 at 3, the Northern District of Texas awarded counsel **$600** an hour for work in a qui tam case. *Becker*, 2013 WL 1293818 at *29 n.17. The court, however, cautioned it "did not conduct a critical and detailed analysis of the reasonableness of the hourly rate requested …, and [the] opinion is not to be used as authority that [the] court held that an hourly rate of **$600** was reasonable for [the relator's counsel]." *Id.* That case does not affect the lodestar analysis here because it was in another market.

Several declarants cite *Bryan v. Colvin*, 3:08-cv-432-J-34MCR, 2014 WL 6827277, at *2 (M.D. Fla. Dec. 3, 2014) (unpublished), to support their opinions that the requested rates are reasonable. Doc. 60-8 at 8 n.2; Doc. 60-9 at 6 n.1; Doc. 60-11 at 5 n.1. But *Bryan* does not support their opinions. *Bryan* involved a petition for approval of attorney's fees under 42 U.S.C. § 406(b) and a contingency-fee contract for representation of a social-security claimant. *See Bryan*, 2014 WL 6827277, at *1. Fees under § 406(b) are considered not under the lodestar approach but under the framework in *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002), in which the Supreme Court endorsed the use of contingent-fee arrangements in social-security cases subject to court review to avoid a windfall detrimental to claimants who must pay the fees from back-pay awards while encouraging representation of claimants. That this Court partially approved fees based on a contingency-fee contract after undertaking a *Gisbrecht* review does not support the requested rates under the lodestar approach that the Court must undertake here.

Applying a "contingency multiplier" as Henrichsen and Thomas suggest is

unwarranted. Contingency multipliers are not permitted under federal fee-shifting statutes. *City of Burlington v. Dague*, 505 U.S. 557, 565–66 (1992); *see McKenzie v. Cooper, Levins & Pastko, Inc.*, 990 F.2d 1183, 1186 (11th Cir. 1993) (reversing district court's contingency enhancement in award under fee-shifting statute).

Accepting the alternative rates Nichols presents based on the *Laffey* matrix likewise is unwarranted. *See* Doc. 60-1 at 22; Doc 60-10. There are two versions of the *Laffey* matrix. *Thomas v. D.C.*, 908 F. Supp. 2d 233, 236 n.2 (D.D.C. 2012). The *Laffey* matrix offered here is a matrix of hourly rates for attorneys with varying experience levels, paralegals, and law clerks prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371–74 (D.D.C. 1983), *rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984); Civil Division, United States Attorney's Office, District of Columbia, www.justice.gov/sites/default/files/usaodc/legacy/2014/07/14/Laffey%20Matrix_2014-2015.pdf, explanatory notes 2–4 (last visited Aug. 18, 2016). Because the rates in the matrix are based on the prevailing market rates in the D.C. area, this Court has declined to use it as irrelevant to prevailing market rates in places in the Middle District of Florida. (See, for example, the numerous cases listed in endnote 34.[34]) Although Nichols says she is "entitled" to alternative rates based on the *Laffey* matrix, Doc. 60-1 at 22, she has not explained the basis for her entitlement, and I know of no such basis.

Thus, where supported by evidence and my own knowledge, I recommend reasonable hourly rates based on the prevailing market rate in Jacksonville for

38

similar services by lawyers and paralegals of reasonably comparable skills, experience, and reputation (Oswald (**$450**), Scher (**$450**), and Becnel (**$125**)), and, where unsupported by evidence, the reasonable hourly rates based on the prevailing market rates in Jacksonville for similar services by entry-level billers (Bledsoe (**$125**), Kruse (**$175**), Downing (**$175**), Ebrahimian (**$125**), Hinton (**$100**), O'Sheehan (**$175**), Peterson (**$175**), and Woodfield (**$250**)). I do not recommend applying national rates or the *Laffey* matrix.

3.    *The Lodestar Figure*

The recommended number of hours reasonably expended (**323.88**) multiplied by the recommended reasonable hourly rates results in a lodestar figure of **$65,795**:

| Biller | Adjusted Hours | Adjusted Rate | Amount |
|---|---|---|---|
| Aranibar, Clara | 0 | 0 | **$0.00** |
| Becnel, Philip | 100 | $125 | **$12,500.00** |
| Benson, Dillan | 0 | 0 | **$0.00** |
| Bledsoe, Kenneth | 64.62 | $125 | **$8077.50** |
| Carter, Adam | 0 | 0 | **$0.00** |
| Downing, Andrea | 11.7 | $175 | **$2047.50** |
| Ebrahimian, Setareh | 58.86 | $125 | **$7357.50** |
| Frappaolo, Victoria | 0 | 0 | **$0.00** |
| Hinton, Jean | 0.8 | $100 | **$80.00** |
| Kruse, Kellee | 0.3 | $175 | **$52.50** |
| O'Sheehan, Edward | 6.4 | $175 | **$1120.00** |
| Oswald, Scott | 6.7 | $450 | **$3015.00** |
| Peterson, Richard | 1.6 | $175 | **$280.00** |
| Scher, David | 65.2 | $450 | **$29,340.00** |
| Woodfield, Nicholas | 7.7 | $250 | **$1925.00** |
| **Total** | **323.88** | | **$65,795.00** |

4.    *Adjustments*

There is a "strong" presumption the lodestar figure is sufficient. *Perdue*, 559

U.S. at 552. An enhancement may be awarded in "rare" and "exceptional" circumstances. *Id.* "[A]n enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Id.* at 553. Novelty and complexity generally may not be considered because they are normally reflected in the number of hours recorded, and the quality of work generally may not be considered because it is normally reflected in the hourly rate. *Id.*

The strong presumption the lodestar figure is sufficient "may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Id.* at 554. Novelty and complexity justify a higher fee only in "the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional." *Blum v. Stenson*, 465 U.S. 886, 899 (1984) (internal quotation marks omitted).

The results obtained are pertinent only to the extent they were obtained by superior performance as opposed to "inferior performance by defense counsel, unanticipated defense concessions, unexpectedly favorable rulings by the court, an unexpectedly sympathetic jury, or simple luck." *Perdue*, 559 U.S. at 554. In a rare case, "an enhancement may be appropriate where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation." *Id.* at 554–55. "This may occur if the hourly rate is determined by a formula that takes into

40

account only a single factor (such as years since admission to the bar) or perhaps only a few similar factors." *Id.* at 555 (internal footnote omitted).

"The presence of a pre-existing fee agreement may aid in determining reasonableness" but does not, in itself, justify reducing an attorney's fee award. *Blanchard*, 489 U.S. at 93−94. A "reasonable" attorney's fee contemplates reasonable compensation for reasonable time, "no more no less." *Id.* If a contingency agreement provides less than a reasonable fee, the defendant must pay the higher amount, but if a contingency agreement provides more than a reasonable fee, the defendant is not required to pay the higher amount, *id.* at 93–94; *accord U.S. ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 793 F. Supp. 2d 1260, 1265 (D. Colo. 2011) ("Neither [relator] nor his attorneys' actions with regard to each other impact the Defendant's statutory obligation to pay reasonable attorney fees under 31 U.S.C. § 3730(d)(2).").

Nichols has offered no specific evidence to show a rare or exceptional circumstance that would rebut the strong presumption that the lodestar figure is sufficient. *See Perdue*, 559 U.S. at 551. Although Scher contends "[e]xceptional" success was obtained largely because of The Employment Law Group's "specialization and focused preparation," Doc. 60-7 at 7, the undeniable specialized skill of Oswald and Scher has already been considered in the reasonable rates for them, any complexity has already been considered in the reasonable hours expended on the case, and it is difficult to define the success as exceptional—as opposed to just plain old success—in light of the small theoretical recovery relative to larger qui tam cases, the absence of any admission or finding of liability that could have supported a firm

41

conclusion here that the case uncovered and halted major fraud against the United States, and the absence of facts to indicate how much if any credit should be given to the United States' investigation and intervention.

I recommend no adjustment and therefore recommend an award in the lodestar amount of **$65,795.00.**

### B.    Costs

Because § 3730(d) requires "reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs," a court deciding a relator's petition for attorney's fees and costs is not limited by the allowable costs in Federal Rule of Civil Procedure 54(d) and 28 U.S.C. §§ 1920 and 1923. *See Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016) (distinguishing "expenses" from "costs" in the False Claims Act); *U.S. ex rel. Lindenthal v. Gen. Dynamics Corp.*, 61 F.3d 1402, 1413 (9th Cir. 1995) (same).

Nichols seeks **$6173.40** in costs. I recommend deducting **$2261.18** as redundant or unnecessary. They are from an invoice of local counsel for Hinton's work also included in the billing entries and therefore redundant (or, for travel to Jacksonville to hand deliver the qui tam complaint for filing under seal, unnecessary). *Compare* Doc. 60-4 (entries 195, 196, 201, 208, 214) *with* Doc. 60-5 (entries 21, 33). The remaining costs appear to have been necessarily incurred (non-duplicative investigation expenses, the filing and special-admission fees for this case, online legal research, PACER research, mailings, telephone conferences, long-distance telephone calls, photocopies, electronic-discovery services, and travel costs for meetings and the

settlement conference). Applying that sole deduction, I recommend awarding **$3912.22**, which includes the cost of the filing fee the clerk already taxed against The Sleep Medicine Center, Zachary, and Restea. *Compare* Doc. 8 *with* Doc. 60-5 (entry 15).

## C.   *Apportionment*

Nichols summarily requests through the proposed order (but not in the amended petition or the memorandum of law) an award imposed jointly and severally against The Sleep Medicine Center, Zachary, and Restea. Doc. 60-2.

A court awarding attorney's fees and costs has discretion as to "how to divide liability." *Council for Periodical Distrib. Ass'ns v. Evans*, 827 F.2d 1483, 1487–88 (11th Cir. 1987) (internal emphasis omitted). In apportioning amounts, a court should try "to achieve the most fair and sensible solution that is possible." *Id.* at 1488.

"Although there is not one method available to achieve a fair and sensible solution, there are some generally-accepted guideposts to inform the district court's discretion." *Patrol Servs.*, 202 F. App'x at 362. The court should consider the purpose of the statute under which the petitioner brings her petition. *Id.* The court "should also consider whether the injury is divisible … to determine whether it should apportion fees equally among defendants, joint and severally, or by some other method." *Id.* "For instance, it may be appropriate to apportion fees between an active instigator and a more passive co-defendant." *Id.* The court should also "consider institutional concerns, such as any federal policies an award may offend." *Id.*

The court should "avoid large discretionary allocations to insolvent

43

defendants." *Id.* (internal quotation marks omitted). And the court should avoid rulings creating "perverse incentives that discourage useful settlements and encourage projected litigation." *United States v. Aisenberg*, 358 F.3d 1327, 1343 (11th Cir. 2004). In a False Claims Act case, the Eleventh Circuit held a district court should not have considered the settlement agreement of a defendant who settled the matter of attorney's fees to a relator to determine an award of attorney's fees to defendant who had not settled that matter. *Patrol Servs.*, 202 F. App'x at 361. The court explained, "In multi-party litigation, there will be a disincentive to be the first party to settle, because the other parties who wait will have their awards reduced by the settling party's degree of culpability." *Id.*

"There are various approaches a … court may use to achieve a fair result." *Id.* "For instance, one approach is to apportion attorney's fees in accord with each defendant's relative degree of culpability." *Id.* "Alternatively, the … court may apportion fees based on the amount of time spent by a plaintiff in preparing the case against each defendant." *Id.* If "one defendant is solely responsible for a claim or a defense, the … court may hold that defendant liable for fees related to that claim." *Id.* "If one approach will not achieve a fair result, the district court may combine two or more of the methods depending on the facts and nature of the case." *Id.*

The circumstances here warrant a joint and several award of attorney's fees against The Sleep Medicine Center, Zachary, and Restea without consideration of Decerce's and Young's settlements. The injury is not divisible—Zachary and Restea allegedly played active roles in the fraud and contributed to a cohesive scheme. S*ee,*

*e.g.* Doc. 1 ¶¶ 19, 45–47, 49–53, 67–69, 84–90. The fees are not allocable to individual defendants—though Restea does not seem implicated in the retaliation claim, the billing records do not divide the charges by claim and there is no indication any claim was addressed separately from another. *See generally* Doc. 60-4. Zachary and The Sleep Medicine Center have defaulted on their payments and Zachary is nowhere to be found for collection purposes. Docs. 50, 53, 72, 73. Because granting a joint and several award of attorney's fees would increase the chance that Nichols will recover the attorney's fees and costs owed to her, such an award follows the purpose of the attorney's fee provision of the False Claims Act. *See Taxpayers Against Fraud,* 41 F.3d at 1035 (attorney's fee and cost provision of False Claims Act incentivizes whistleblowers to step forward and attorneys to pursue such actions).

Thus, I recommend awarding attorney's fees and costs against The Sleep Medicine Center, Zachary, and Restea on a joint and several basis.

## IV.    Recommendation[35]

I recommend the Court:

1.    **grant in part** Donna Nichols's amended petition for attorney's fees and costs, Doc. 60, as supplemented, Doc. 75;

2.    **award** Donna Nichols **$65,795.00** in attorney's fees and **$3912.22** in costs, for a total of **$69,707.22**, against The Sleep Medicine Center, Hubert Michael Zachary, and George Liviu Restea, jointly and severally; and

3.    **direct** the clerk to enter judgment for **$69,707.22** in favor of Donna Nichols and against The Sleep Medicine Center, Hubert Michael Zachary, and George Liviu Restea, jointly and severally, and then close the case.

**Entered** in Jacksonville, Florida, on August 23, 2016.

45

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

Copies to:

Counsel of record

George Liviu Restea, M.D.
132 East Madison Street
Starke, FL 32091

---

[1]For consistency, all page numbers cited in this report and recommendation are the CM/ECF page numbers in the document headers rather than the actual page numbers in the document footers.

[2]In the legal context, "costs" are not synonymous with "expenses." *Assocs. Against Outlier Fraud v. Huron Cons. Grp., Inc.* 817 F.3d 433, 436−37 (2d Cir. 2016). Costs are listed in 28 U.S.C. § 1920 and cover "relatively minor, incidental expenses," while expenses are "borne by litigants for attorneys, experts, consultants, and investigators." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2006 (2012). A successful relator may recover both. *See* 31 U.S.C. § 3730(d) (allowing "costs," "expenses," and "attorney's fees"). Nichols uses "costs" to refer to "costs" and "expenses" and combines them into one request, including the **$350** filing fee already taxed by the clerk. *See generally* Docs. 60, 60-5. For consistency, this report and recommendation does the same.

[3]Nichols filed a separate motion and memorandum, in violation of Local Rule 3.01(a), and a proposed order, in violation of the Administrative Procedures for Electronic Filing, IV.A.4. For efficiency, I do not recommend striking the documents for non-compliance with the Court's rules and procedures.

[4]According to declarations of Nichols's attorneys, The Employment Law Group represented her on a contingent-fee basis because she has "limited financial resources" and because of "the important public policy issues involved." Doc. 60-7 at 2; Doc. 60-8 at 8.

[5]Nichols provides more detailed allegations underlying the claims in the amended petition. Doc. 60-1 at 2−5. It is unnecessary to repeat them to properly decide the amended petition.

[6]Nichols requested a hearing on the amended petition. Doc. 60. By setting and later conducting the hearing, the Court granted the request. Doc. 66.

46

[7]A process server personally served Restea with the order setting the hearing and the amended petition, and Nichols's counsel sent him a letter via certified and first class mail delivered to his home explaining the relief sought against him and advising him to attend the hearing. Doc. 73 at 2; Doc. 73-1; Doc. 73-2 at 4−5. At the hearing, counsel for the United States indicated Restea's counsel had passed away. Having been personally served, Restea was responsible for defending his interests either by appearing or retaining new counsel to appear on his behalf.

[8]Federal Rule of Civil Procedure 4 requires proper service of a summons and the complaint. Fed. R. Civ. P. 4(c). It provides that serving a summons establishes personal jurisdiction over a defendant subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located. Fed. R. Civ. P. 4(k)(1)(A). And it provides, "If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).

Nichols tried but failed to serve The Sleep Medicine Center and Zachary with the summons and complaint. She says nothing about the failure in the amended petition or supplemental briefing. *See generally* Doc. 60, 75.

The defense of insufficiency of process is waivable. *Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 901 (11th Cir. 1990). In deciding waiver, a court considers all circumstances to decide if the defect underlying the insufficiency prejudiced the defendant. *Id.* Pertinent are whether the defendant had actual notice of the case and whether he had acted with "studied indifference" or "deliberate inaction." *Id.*

"[P]rocess servers are not entirely at the mercy of elusive defendants." *N.L.R.B. v. Clark*, 468 F.2d 459, 464 (5th Cir. 1972). "A defendant who beclouds his whereabouts should not be entitled to benefit from the process server's consequent confusion." *Id.* "[D]ue process does not require receipt of actual notice in every case"; service is adequate if it is in a form reasonably calculated to provide the defendant knowledge of the proceedings and an opportunity to be heard. *Id.*; *see Frank Keevan & Son, Inc. v. Callier Steel Pipe & Tube Co.*, 107 F.R.D. 665, 671 (S.D. Fla. 1985) ("If the court finds that the defendant received notice of the complaint and the plaintiff made a good faith effort to serve the defendant …, then the court will most likely find that service of process has been effective. Effective service is most likely found when a defendant has engaged in deception to avoid service of process.").

The Sleep Medicine Center through Zachary and Zachary himself clearly knew about this case; the settlement agreement he signed references it under "Recitals" and he agreed to the entry of the consent judgment against them in this case upon uncured default. Doc. 75-1 at 2, 4−5, 20−21. Nichols has made numerous attempts to serve them at addresses associated with them and thus in a way reasonably calculated to provide them with knowledge of the proceedings and an opportunity to be heard. Doc. 72 at 3−5; Doc. 73 at 3−5. Through their failure to pay as promised

47

and failure to communicate with anyone involved in this case, they have shown at best studied indifference and at worst active concealment. Their actions or inactions should not enure to their benefit. Discerning no due-process concern under those circumstances (whether considering notice or personal jurisdiction), I recommend ruling on the amended petition despite any insufficient service.

[9]There is no transcript of the July 2015 hearing. A party may order one if interested. A digital recording is available for the Court's use.

[10]Nichols does not request interest on an award in the amended petition, the memorandum of law, or the proposed order. *See generally* Docs. 60, 60-1, 60-2. But within their declarations, her attorneys summarily ask for interest on any award from the date the Court dismissed the claims against The Sleep Medicine Center, Zachary, and Restea. Doc. 60-6 at 5; Doc. 60-7 at 7.

Federal Rule of Civil Procedure 7(b)(1) and Local Rule 3.01 together require requested relief to be presented in a motion supported by a memorandum of law. Because Nichols did not ask for interest in the amended petition, the memorandum of law, or even the proposed order or otherwise provide any briefing on whether dismissal upon stipulation equates to judgment under the interest statute, 28 U.S.C. § 1961(a), or, for The Sleep Medicine Center and Zachary, why the consent-judgment date should not apply instead, I recommend not awarding interest from the dismissal date but not precluding interest under § 1961(a) from the date of entry of judgment on the attorney's fees and cost award. *See BankAtlantic v. Blythe Eastman Pain Webber, Inc.,* 12 F.3d 1045, 1052 (11th Cir. 1994) *(*§ 1961 applies to judgment for attorney's fees and costs).

[11]Although Nichols is asking for **$111,091** in attorney's fees, Doc. 60-1 at 23, the amounts on the billing entries total **$111,191**, Doc. 60-4.

[12]The billing entries total 363.80 hours but that figure includes 1.1 hour by Nicole Raviele not billed. *See* Doc. 60-4 at 25.

[13]The statement in the amended petition, "[T]he settlement agreements with the Defendants allowed [Nichols's] counsel to engage in negotiations with Defendants' counsel to resolve such matters," Doc. 60-1 at 6, is dubious. Both the settlement agreement with The Sleep Medicine Center and Zachary and the settlement agreement with Restea include under "Recitals" that provide background, "Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs." Doc. 75-1 at 3; Doc. 75-2 at 3. Both agreements include under "Terms and Conditions" an express statement of claims the United States was not releasing (for example, claims of tax and criminal liability) but no reservation from either the United States or Nichols concerning attorney's fees. Doc. 75-1 at 7−8; Doc. 75-2 at 6−7. Both agreements include under "Terms and Conditions," "Each party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement." Doc. 75-1 at 14; Doc. 75-2 at 8. And

48

both agreements include under "Terms and Conditions," "This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties." Doc. 75-1 at 15; Doc. 75-2 at 9.

At the hearing on the amended petition, the Court asked Nichols's counsel why she was seeking attorney's fees and costs in light of the statement in both settlement agreements, "Each party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement," Doc. 75-1 at 14; Doc. 75-2 at 8. He conceded the agreements could have been worded better but contended that provision must be read with the recital statement, "Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs," to find ambiguity and the parties' intent had been to negotiate them separately. Doc. 75-1 at 3; Doc. 75-2 at 3. Counsel for the United States agreed and explained a model settlement agreement had been used and in all or the vast majority of other cases, the relator settles a claim for attorney's fees and costs within the agreement with a provision (or by a separate contemporaneous agreement) stating the defendant agrees to pay the relator a certain amount for them. He explained the circumstances here were different because Nichols, The Sleep Medicine Center, Zachary, and Restea could not agree on them.

In supplemental briefing, Nichols contends the words, "this matter," in "Each party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement," Doc. 75-1 at 14; Doc. 75-2 at 8, are ambiguous but the parties understood them to "refer solely to the matter of the settlement agreement and the underlying claims" without incorporating attorney's fees awardable under § 3730(h) (part of the False Claims Act). Doc. 75 at 5–6. Without referencing her release of The Sleep Medicine Center and Zachary, she points to the United States' release and the recital provision to argue the agreements "clearly" exclude attorney's fees and costs. *See generally* Doc. 75. She argues to the extent the agreements are ambiguous, the Court may consider parole evidence showing intent to separately petition for attorney's fees and costs to her. Doc. 75 at 6–7. She attaches a declaration and emails showing her counsel had tried to resolve them to no avail. Docs. 75-3; 75-6, 75-7. In one email, her counsel suggested to United States' counsel the agreement with Restea should "basically say that if the parties do not reach agreement … Relator is free to file a petition" and "it is likely we will need to file a fee petition and proceed with the 3730h claim post-settlement and therefore the settlement agreements should indicate as such (or simply not address the issue)." Doc. 75-8. It appears the parties chose the latter route without deleting the seemingly inconsistent form language, "Each party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement" used when the relator and the defendant have successfully negotiated them.

An argument—perhaps a strong one—could be made the settlement agreements unambiguously preclude further litigation on attorney's fees and costs to

Nichols given the provision, "Each party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement," Doc. 75-1 at 14; Doc. 75-2 at 8, and the express reservation of certain claims, Doc. 75-1 at 7–8; Doc. 75-2 at 6–7, with no mention of an express reservation of a claim for attorney's fees and costs to Nichols. This is particularly so with respect to the settlement agreement with The Sleep Medicine Center and Zachary in which Nichols released her claims against them and in light of the motion for the entry of consent judgment stating the settlement agreement resolved the claims against them, "**including the relator's counsel's fees** and the relator's share to be paid from the recovery of the United States." Doc. 53 at 1 (emphasis added). But because The Sleep Medicine Center, Zachary, and Restea have not appeared to make that argument (and The Sleep Medicine Center's and Zachary's apparent breach of the settlement agreement by failing to pay places it on shaky ground), I do not recommend denying the petition on that basis.

[14]*See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984).

[15]At the hearing on the amended petition, Nichols's counsel explained "law clerks" are fulltime employees of The Employment Law Group who attend law school at night.

[16]Nichols provides no information on Hinton, but it appears from the billing records and cost records she is a paralegal at Shutts & Bowen. *See* Doc. 60-4 at 12, Doc. 60-5 at 4.

[17]U.S. News and World Report rated The Employment Law Group as one of the nation's best firms in 2014. Doc. 60-6 at 2. It currently is litigating approximately 145 state and federal cases (38 of which are qui tam cases) and has several matters pending before federal agencies. Doc. 60-6 at 4; Doc. 60-7 at 6. It routinely declines hundreds of requests for representation each week. Doc. 60-6 at 4.

[18]Oswald is the managing principal of The Employment Law Group. Doc. 60-6 at 2. He was graduated from Howard University Law School in 1997 and is a member of many state and federal bars. Doc. 60-6 at 2; Doc. 60-7 at 3. He has practiced employment law since 1998, now focuses his practice on employment and qui tam litigation, has developed a reputation as an expert in those areas, and has successfully pursued many high-dollar cases in those areas. Doc. 60-6 at 2–3; Doc. 60-7 at 3. Martindale-Hubbell rates him "AV." Doc. 60-6 at 2. The National Trial Lawyers recognized him as one of the top 100 trial lawyers in 2013 and 2014. Doc. 60-2 at 3. Several publications have recognized him as a leader in employee-side employment law. Doc. 60-6 at 2. He is the immediate past president and current board member of the Metropolitan Washington Employment Lawyers Association, the Washington, D.C., affiliate of the nation's largest and most renowned employee-side employment law association. Doc. 60-6 at 2; Doc. 60-7 at 3.

[19]Scher is a principal at The Employment Law Group. Doc. 60-6 at 3; Doc. 60-

7 at 2. He was graduated from Fordham Law School in 1993 and is a member of many state and federal bars. Doc. 60-6 at 3; Doc. 60-7 at 2. He began his career practicing corporate commercial litigation, then worked for large corporations practicing commercial, technology, and intellectual property law, then worked for a company providing electronic discovery consulting to top law firms. Doc. 60-6 at 3; Doc. 60-7 at 2. He has successfully represented many whistleblowers in high-dollar cases. Doc. 60-7 at 2–3. The National Trial Lawyers recognized him as one of the top 100 trial lawyers in 2014. Doc. 60-7 at 2.

[20]Bledsoe is a law clerk at The Employment Law Group. Doc. 60-7 at 3. He has worked there since 2012. Doc. 60-7 at 4. He was graduated from American University Washington College of Law in 2014. Doc. 60-7 at 3.

[21]Ebrahimian is a law clerk at The Employment Law Group. Doc. 60-7 at 4. She was graduated from George Washington University in 2012 and American University Washington College of Law in May 2016. Doc. 60-7 at 4.

[22]Becnel is the managing partner of Denolt Becnel & Wells Investigative Group LLC. Doc. 60-7 at 4. He has a master's degree in criminal justice from Boston University. Doc. 60-7 at 4. He is a licensed private investigator in Virginia, Maryland, and Washington, D.C., and a certified fraud examiner. Doc. 60-7 at 4. He teaches investigation-related classes. Doc. 60-7 at 4. He is a member of the Private Investigators Association of Virginia and National Counsel of Investigative & Security Services. Doc. 60-7 at 9.

[23]Helmer is the president of Helmer, Martins, Rice & Popham Co., L.P.A., in Cincinnati, Ohio. Doc. 60-8 at 2. He was graduated from the College of Law of the University of Cincinnati in 1975, where he served as the editor-in-chief of its law review and was elected to Order of the Coif. Doc. 60-8 at 3. He was admitted to the Ohio bar in 1975, is a member of several other federal court bars, and has been specially admitted in many other federal courts. Doc. 60-8 at 3. He served as a federal law clerk from 1975 to 1977 and then went into private practice. Doc. 60-8 at 3. There are over 300 published opinions in cases in which he was lead counsel, 100 of which involved the False Claims Act, and he successfully argued an interpretation of the False Claims Act before the United States Supreme Court. Doc. 60-8 at 3–4. He is "probably the only lawyer in America whose practice has focused consistently on litigating cases pursuant to the False Claims Act since 1984." Doc. 60-8 at 3. Many of the False Claims Act cases in which he was lead counsel involved issues of first impression or resulted in "record recoveries from government contractors who cheated the United States." Doc. 60-8 at 3. The False Claims Act cases in which he was lead counsel "have recovered approximately **$1 billion**." Doc. 60-8 at 3. He has delivered more than 100 lectures at seminars regarding civil litigation, trial practice, the False Claims Act, employment law, and attorney's fees, including teaching classes at several law schools. Doc. 60-8 at 4. Martindale-Hubbell rates him "AV" and has for more than 30 years. Doc. 60-8 at 4. He has testified before federal congressional committees about amendments to the False Claims Act, and all of his suggestions

have become law. Doc. 60-8 at 4. Numerous publications have rated him among the best lawyers in the nation and have praised his work. Doc. 60-8 at 4–5. Courts have accepted him as an expert on the False Claims Act. Doc. 60-8 at 5. He has authored a treatise and numerous articles on the False Claims Act. Doc. 60-8 at 5. He has "substantial experience" with respect to the cost of legal representation, and practitioners therefore regularly consult with him. Doc. 60-8 at 6. Many courts have accepted him as an expert on attorney's fees. Doc. 60-8 at 6.

[24]Thomas has his own firm, Law Offices of Archibald J. Thomas, III, P.A., in Jacksonville, limited to the representation of employees in "all aspects of labor and employment law." Doc. 60-9 at 3. He was graduated from Stetson University College of Law in 1977, where he was a member of the law review. Doc. 60-9 at 3. He served as a federal law clerk and Assistant Federal Defender before establishing his firm. Doc. 60-9 at 3. He is board certified by The Florida Bar in Labor and Employment Law. Doc. 60-9 at 2. He is admitted to practice in Florida and is a member of many federal court bars. Doc. 60-9 at 4. He has written numerous articles on employment law and lectured extensively on employment law, including teaching employment trial skills to new lawyers at the Stetson University College of Law. Doc. 60-9 at 2–3. Martindale-Hubbell rates him "AV." Doc. 60-9 at 2. He is a member of the Jacksonville Bar Association. Doc. 60-9 at 3. He serves on the Sexual Harassment, Age Discrimination, and Federal Employee and Title VII committees of the National Employment Lawyers Association. Doc. 60-9 at 3. He is also a member of Executive Council of the Labor and Employment Section of the Florida Bar, where he serves as chair of the Current Legal Developments Committee and Co-Chair of the Individual Rights Committee. Doc. 60-9 at 3. He served as a member of The Florida Bar Labor and Employment Law Certification Committee from 2002 to 2008. Doc. 60-9 at 2. He is the past president and state chapter co-chair of the Florida Chapter of the National Employment Lawyers Association and a member and past president of the Jacksonville Chapter of the Federal Bar Association. Doc. 60-9 at 2–3.

Thomas has "[d]irect experience with statutory fee litigation" for his own rates and others and is "reasonably well acquainted with the prevailing market rates in the Middle District of Florida for employment litigation." Doc. 60-9 at 4. He has an office in Jacksonville and has endeavored to remain familiar with market rates by reading other fee applications and supplying affidavits and discussing current rates with other attorneys in large and small firms in central Florida. Doc. 60-9 at 4.

[25]Henrichsen is a founding member of Henrichsen Siegel, PLLC, founded in 2000. Doc. 60-11 at 2. Its office is in Jacksonville. Doc. 60-9 at 3. Martindale-Hubbell has rated him "AV." Doc. 60-9 at 2. He was graduated from the Washington College of Law, The American University, in 1988. Doc. 60-9 at 2. He has an M.A. in Law and International Affairs from The American University, School of International Service. Doc. 60-9 at 2. He is a member of several state and federal bars. Doc. 60-9 at 2. His practice "focuses on the representation of businesses and individuals in domestic and international commercial disputes, plaintiff-side employment/labor matters and civil rights plaintiff-side cases." Doc. 60-9 at 2. He is an active member of many voluntary

bar associations and a board member of Jacksonville Area Legal Aid. Doc. 60-9 at 3. He has direct experience with statutory fee litigation with respect to his own rates and those of other employment law lawyers. Doc. 60-9 at 3. He is "reasonably well acquainted with the prevailing market rates in the Middle District of Florida for employment litigation." Doc. 60-9 at 3. He has endeavored to remain familiar with current market rates for employment litigation in the Middle District of Florida, including Jacksonville, by reading fee applications of other lawyers, supplying affidavits, and discussing current rates with lawyers in small and large firms. Doc. 60-9 at 3.

[26]The first-to-file rule provides, "When a person brings an action ... no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5) (emphasis added); *accord Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 135 S. Ct. 1970, 1978 (2015).

[27]Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

[28]Helmer, Nichols, and Scher contend the United States was able to recover **$306,905** through this case. Doc. 60-1 at 11; Doc. 60-7 at 7; Doc. 60-8 at 9. That contention apparently does not consider non-collection of the **$200,000** The Sleep Medicine Center and Zachary had agreed to pay before disappearing or any amounts later recovered from Young and Decerce.

[29]Neither *Hensley* nor *Norman* involved the False Claims Act, but case law on "reasonable" fees applies to federal fee-shifting statutes allowing "reasonable" fees. *Indep. Fed. of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n.2 (1989).

[30]Rule 4-3.6 of The Florida Bar Rules of Professional Conduct prohibits a lawyer from making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that proceeding." There is no indication Nichols's attorneys violated that rule through work for marketing and media strategy.

[31]What an attorney charges his clients may be powerful evidence of his market rate. *Dillard v. City of Greensboro*, 213 F.3d 1347, 1354–55 (11th Cir. 2000). As explained by Oswald and Scher, The Employment Law Group customarily charges the requested rates in qui tam cases. Doc. 60-6 at 4; Doc. 60-7 at 4. Without explanation of whether The Employment Law Group customarily charges the requested rates in Jacksonville, whether clients pay or courts award the customary charges, and whether the customary charges are gleaned from contingency-fee agreements or hourly billing, it is difficult to assign them powerful weight here.

[32]Though qui tam cases might have been rare at one time, they do not appear to be so now. A 2015 press release from the Department of Justice states

whistleblowers filed 638 qui tam suits in that fiscal year. U.S. Department of Justice, *Justice Department Recovers Over $3.5 Billion From False Claims Act Cases in Fiscal Year 2015* (Dec. 3, 2015), https://www.justice.gov/opa/pr/justice-department-recovers-over-35-billion-false-claims-act-cases-fiscal-year-2015. A search of the term "False Claims Act" on the website for the United States Attorney's Office for the Middle District of Florida, https://www.justice.gov/usao-mdfl, reveals an extensive list of press releases describing recent qui tam cases.

[33]In *Liotine,* the Southern District of Illinois approved hourly rates similar to those requested here. *Liotine*, 2013 WL 5366960, at *6. (The relator requested an hourly rate of **$600** for the lead partner (Helmer), **$525** for other senior partners, **$380** for associates, and **$175** for paralegals. *U.S.A. v. CDW-Gov't, Inc.*, No. 305CV00033DRHPMF, 2013 WL 11267176, at *2 (S.D. Ill. May 17, 2013).) The relator provided Helmer's affidavit, which affirmed the requested rates were the rates his law firm charged in False Claims Act cases and followed the rates it charged in non-False Claims Act cases. *Liotine*, 2013 WL 11267176, at *2. In accepting the requested rates, the court relied heavily on a Seventh Circuit opinion that held an attorney's customary hourly rate is "presumptively appropriate" to use as the market rate, and once an attorney presents evidence of this, the defendant must show why a lower rate is "essential." *Liotine*, 2013 WL 5366960, at *2 (citing *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996)).

[34]This Court has declined to use the *Laffey* matrix in the following cases *Holman v. Student Loan Xpress, Inc.,* 778 F. Supp. 2d 1306, 1312 (M.D. Fla. 2011); *Thomas v. Arm WNY, LLC*, 3:14-cv-360-J-39MCR, 2014 WL 6871654, at *8 (M.D. Fla. Dec. 3, 2014) (unpublished); *Bryan v. Colvin*, 3:08-cv-432-J-34MCR, 2014 WL 6827277, at *2 (M.D. Fla. Dec. 3, 2014) (unpublished); *Sharke v. Midnight Velvet, Inc.*, 8:12-cv-589-T-24-AEP, 2013 WL 2467786, at *2 (M.D. Fla. Jun 7, 2013) (unpublished); *Walker v. Ruben & Rosenthal, Inc.*, 6:13-cv-798-ORL-18, 2013 WL 5720248, at *5 (M.D. Fla. Oct. 21, 2013) (unpublished); *Zachloul v. Fair Debt Collections & Outsourcing*, 8:09-cv-128-T-27MAP, 2010 WL 1730789, at *2 n.3 (M.D. Fla. Mar. 19, 2010), *report and recommendation adopted sub nom. Zaghloul v. Fair Debt Collections & Outsourcing*, 8:09-cv-128-T-27MAP, 2010 WL 1727459 (M.D. Fla. Apr. 27, 2010) (unpublished); *Raimondi v. Zakheim & Lavrar, P.A.*, 6:11-cv-480-ORL-31, 2012 WL 1382255, at *6 (M.D. Fla. Apr. 5, 2012), *report and recommendation adopted,* 6:11-cv-480-ORL-31, 2012 WL 1382221 (M.D. Fla. Apr. 20, 2012) (unpublished); *Renninger v. Phillips & Cohen Associates, Ltd.*, 8:10-cv-5-T-33EAJ, 2010 WL 3259417, at *2 (M.D. Fla. Aug. 18, 2010) (unpublished); *Cook v. Law Offices of Forster & Garbus*, 6:10-cv-934, 2010 WL 4941439, at *3 (M.D. Fla. Nov. 3, 2010), *report and recommendation adopted,* 6:10-cv-934, 2010 WL 4941659 (M.D. Fla. Nov. 29, 2010) (unpublished).

[35]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served

with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.